Beecher *v.* Bennett.

A new trial is granted; costs to abide the event.

[JEFFERSON GENERAL TERM, July 7, 1851. *Pratt, Gridley, Allen* and *Hubbard,* Justices.]

## BEECHER *vs.* BENNETT.

Prior to, and on the 18th of December, 1846, the plaintiff was a joint owner, with W. & B., of a quantity of clover seed. On that day an arrangement was made between the parties, by which it was agreed that the plaintiff should hold on to the clover seed, (which was then stored at B. in his name and for his account, and subject to his order,) and sell it as he saw fit, if necessary to pay certain drafts which had been drawn by the plaintiff upon W. & B. to pay for the clover seed, and which drafts were then due and unpaid, W. & B. having failed in business. Subsequent to this arrangement, W. & B. transferred the clover seed to the defendant, in payment of individual debts owing by them to him; and he obtained possession of the property. In an action of trover, for the clover seed, brought by the plaintiff against the defendant; *Held,* 1. That on the failure of W. & B. the plaintiff had a right to insist upon the application of the property to the payment of the debts contracted in its purchase; which right might be secured by an arrangement between the parties.

2. That the joint owners having, by such arrangement, placed the property in the custody of the plaintiff, for the purpose of paying such debts, and having advised the creditors of the arrangement, they could not afterwards rescind the same, without the consent of all concerned.

3. That the defendant, having taken the assignment from W. & B. with full knowledge of the legal and equitable rights of the plaintiff, was not, as against him, a *bona fide* purchaser of the property, or of the interest of W. & B. therein; but took his assignment subject to the prior rights of the plaintiff, and was liable to him in an action of trover.

Beecher *v.* Bennett.

THIS was an action of replevin, in the detinet, to recover a quantity of clover seed. The action was brought by and in the name of Rial Wright, but upon his death, after the trial of the cause, the present plaintiff, who claimed as assignee, was by order of the court, substituted as plaintiff on the record. The cause was tried before Hon. Hiram Gray, at the Onondaga circuit in October, 1848. Upon the trial, the plaintiff proved that in 1846, Wardwell & Bardwell were commission merchants in Albany, and that an arrangement was made between them and himself that he should go west and purchase produce jointly for himself and Wardwell & Bardwell, to be paid for by drafts to be drawn by him on Wardwell & Bardwell. That there was nothing said as to how the drafts were to be paid or taken up. The plaintiff gave in evidence several letters from W. & B. to himself, written in November, 1846, desiring him to make arrangements to meet the drafts which he had made upon them in pursuance of the arrangement, either by a sale of the produce purchased, or by redrawing upon them, or to forward to their store house receipts to enable them to raise the money. Mr. Wardwell, one of the firm of Wardwell & Bardwell, testified that the plaintiff and Wardwell & Bardwell were to share the profit and loss; that " the partners were Dr. Wright and ourselves " (W. & B.) It also appeared in evidence that the plaintiff was not to furnish any capital, and that it was contemplated that the property purchased should be forwarded to and sold by Wardwell & Bardwell, and the plaintiff was to receive one half the net profits. Wardwell & Bardwell stopped payment about the middle of November, and failed in business about the first of December, 1846. In December, 1846, and before the middle of that month, the clover seed for which this action was brought, arrived at Buffalo, in steamboats, from Ohio, and was stored by the plaintiff in his own name, with H. W. Millard, a warehouseman at that place, who receipted it as " Received in store from Rial Wright, Esq. for his account and subject to his order." On the 18th of December, as Mr. Wardwell testified, his firm made an arrangement with the plaintiff that he should hold onto the clover seed, and sell it as he saw fit, if necessary to pay the drafts which

were due and unpaid, among which were the drafts given on the purchase of the seed in question; and on the same day wrote to the banks holding the drafts, informing them of this arrangement. On a cross-examination he said that the conversation with the plaintiff on this occasion, was in substance as follows: "We said, you made the drafts; we accepted them, and were unable to pay them. The seed is in Buffalo, in your possession: you can sell it as you see fit, and pay the drafts." Wardwell & Bardwell were largely indebted to the Salina Bank upon transactions in which the plaintiff was not interested, and on the 28th of November, 1846, they gave an order on the plaintiff for 700 bushels of clover seed then in his possession, in favor of one E. C. Adams, for the benefit of the bank. On the same day they received of one G. Townsley his acceptances at 20 and 30 days for $3000, on account of purchase of clover seed then lying at Buffalo, on their account, as expressed in the receipt and agreement, and the seed was to be shipped by railroad and subject to the order of Townsley on arrival, to the amount of one thousand bushels. On the 22d of December, 1846, to carry out this arrangement, and also to secure Adams against his liability as drawer of certain bills accepted by Wardwell & Bardwell, and held by the Salina Bank, Wardwell & Bardwell delivered to Townsley a note stating the purchase by Townsley, of them, of two thousand bushels of clover seed, being the same lot of seed purchased for their account by Rial Wright, of Syracuse, and that said seed was subject to the order of Townsley, at Buffalo, (he paying charges, &c.) price $3 per bushel, amount, $6000, and that payment was received by his acceptances dated Nov. 28, 1846, $3000, and by paid E. C. Adams $3000. The $3000 mentioned as paid to Adams, was not paid to him, but was to be paid out of the proceeds of the property. The acceptances of Townsley, of November 28, were given to enable Wardwell & Bardwell to raise money, and were designed to be used in paying for the seed, but were delivered to the Salina Bank upon a former indebtedness of Wardwell & Bardwell. Townsley contested his liability to pay them. The plaintiff refused to recognize the right of Wardwell & Bardwell to dispose of the seed,

Beecher v. Bennett.

and did not deliver it in pursuance of the order and transfer above stated. On the 1st of January, 1847, Townsley, without acknowledging his liability upon his acceptances, and leaving that an open question, transferred to the defendant, who was cashier of the Salina Bank, and acting in its behalf, the bill of sale or transfer of the 22d of December, and all claims under it, and within a day or two thereafter, and in the absence of the plaintiff, the defendant obtained possession of the seed from the warehouse keeper. The defendant had notice of the plaintiff's claim. At the close of the trial, the plaintiff's counsel moved for a nonsuit, on several grounds. The only one which was stated in the bill of exceptions was, that Wardwell & Bardwell and Wright were jointly interested in the property ; that the verbal transaction of December 18, was no more than a mere power to sell the clover seed for the purpose of paying the drafts, which was revocable, and that the subsequent sale or assignment by Wardwell & Bardwell, was a revocation of that power; that under the assignment the defendant had succeeded to all the rights of Wardwell & Bardwell, and having got possession of the property, he was not liable in this action. The court thereupon held and decided that this action at law would not lie, and directed a verdict for the defendant. To which ruling and decision, the plaintiff's counsel excepted, and the jury found a verdict for the defendant, and the plaintiff now moved for a new trial, upon a bill of exceptions.

*L. R. Morgan*, for the plaintiff.

*G. F. Comstock*, for the defendant.

*By the Court*, ALLEN, J. The position taken by the counsel for the defendant upon the trial, and which was sustained by the learned justice, relieves us from the examination of some of the questions which were made upon the argument before us. No question is presented by the bill of exceptions as to the relations which the plaintiff and Wardwell & Bardwell sustained to each other in respect to the property in question, and

their respective rights therein. The defendant assumed upon the trial that Wardwell, Bardwell and Wright were jointly interested in the property, and we can not presume that on any of the grounds taken by the defendant and which are not stated, positions inconsistent with this express admission were taken by him, or that the court based its decision upon a state of facts inconsistent with those admitted by the counsel for the defendant to have been established.

Upon this bill of exceptions, then, it stands admitted that the plaintiff was, prior to and on the 18th of December, 1846, a joint owner of the property in controversy, with Wardwell & Bardwell, and the only question before us grows out of the arrangement made on that day between them, and the effect to be given to it and the subsequent transfer by Wardwell & Bardwell of the property, under which the defendant claims title. The only evidence of the arrangement of the 18th of December, is the testimony of Mr. Wardwell, one of the firm of Wardwell and Bardwell, who testified on his direct examination, as follows : " From about the middle of November we ceased to pay. On the 18th of December we made an arrangement with Dr. Wright that he should hold on to the clover seed, and sell it as he saw fit, if necessary to pay these drafts, which were due and unpaid. It was a verbal agreement. I wrote to the Ohio banks (by whom the drafts were held) the same day, and informed them of the arrangement." On his cross-examination he testified, " The substance of the arrangement of the 18th of December was, that he (the plaintiff) had the seed in his possession and could take care of the drafts." " We said you made the drafts, we accepted them and were unable to pay them. The seed is in Buffalo in your possession : you can sell it as you see fit, and pay the drafts." This arrangement the judge held, in response to the claim of the defendant's counsel, to be a mere power to sell the clover seed for the purpose of paying the drafts, which was revocable : and that the subsequent sale or assignment by Wardwell & Bardwell was a revocation of that power ; that under the assignment the defendant had succeeded to all the rights of Wardwell & Bardwell, and having

got possession of the property he was not liable in this action. Previous to the 18th of December, and of course before the transfer under which the defendant claims title, Wardwell & Bardwell had failed in business, leaving the drafts, given upon the purchase of the clover seed and upon which the plaintiff was liable as drawer, unpaid.

The plaintiff was in possession of the property, holding warehouse receipts therefor in his own name, and the defendant claims to hold the property under a transfer made by W. & B. to pay their individual debts. Whether a technical partnership existed between the plaintiff and Wardwell & Bardwell, with all the rights incident to that relation, in respect to the property at the time of the alledged transfer under which the defendant claims, or at any time, is not necessarily involved in the decision of this cause. The joint ownership of the property on the 18th of December, the indebtedness of the owners, for the same property, and the failure and insolvency of Wardwell & Bardwell, stand admitted upon the record, and there can be no doubt that the plaintiff, as well as the creditors of himself and W. & B. had a right to insist upon the application of the property to the payment of the debts contracted in its purchase. This right could not have been enforced except in a court of equity ; but I apprehend that the same result might well be secured by an arrangement between the parties interested. In the absence of any conventional arrangement of the joint owners, the right to the possession would have been equal in all, and neither would have had the right to claim it from either of the others.

A trust might have been created in a third person, by the act of all the parties, which would have invested such third person, as a trustee, with the possession and right of possession of the joint property, for the benefit of all concerned, and upon proceedings in a court of justice to enforce the rights of the parties and their creditors, in the application of the property to the payment of debts, a receiver of such property would have been appointed, to take possession of the property and dispose of the same under the direction of the court. I am unable to

see why one of the joint owners may not be made the trustee or receiver of this property, by the consent of all, and without the necessity of a formal assignment, or the intervention of a court of justice, subject only to the right of the creditors to object, and insist upon a disposition of the property, which would more effectually secure their interests. The owners consenting to and actually placing the property in the custody of one joint owner for the purposes named, and advising the creditors of the arrangement, can not afterwards rescind this arrangement without the consent of all concerned. The consideration upon which it was made, is ample to sustain it ; and the other joint owners, as well as the creditors, having by this arrangement accomplished all they could hope to do by legal proceedings, to wit, secured the application of the property to the payment of the debts to which by law it should be appropriated, were precluded from taking legal measures to protect those rights. (10 *Paige*, 205.) All that they could transfer was their interest. If a partnership had ever existed between the parties it had ceased to exist, and they were mere tenants in common ; and the assignee of the interest of Wardwell & Bardwell took the assignment subject to the prior rights, legal and equitable, of the plaintiff. (*Marquand* v. *The New-York Man. Co.*, 17 *John.* 525.) It must be irrevocable by the parties originally assenting to it, and consequently by all claiming under them by title subsequently acquired. (*See Bradford* v. *Kennedy*, 3 *John. Ch.* 431.) The power vested in the plaintiff was not a naked power, but a power coupled with an interest. The death of the other parties would not have revoked it, and neither will their subsequent transfer of their interest. It would be unjust to allow an arrangement of this kind, entered into to prevent the necessity of legal proceedings and to secure to parties their legal rights, and no more, to be made and unmade at the pleasure of one of the parties, and especially to allow it to be rescinded to enable a fraud to be perpetrated upon the innocent owners of the property, and their creditors. .

If the party in whom confidence has been reposed by all the owners of the property, is taking measures to divert and mis-

Beecher v. Bennett.

apply the property, the other parties and all claiming under them have a remedy, but not by rescinding the arrangement and resuming the possession of the property. The question made upon this bill of exceptions was before me at special term, upon a demurrer to a complaint in the nature of a bill in equity for a due administration of this property, as the trust property of the plaintiff and W. & B., filed after the decision of this cause, and upon the ground that the remedy of the plaintiff was in equity and not at law, in pursuance of the clear instruction of the learned judge upon the trial of this cause. In accordance with the position then taken by the defendant's counsel I decided that by the agreement of the 18th of December, 1846, the joint possession of the parties was severed, and the plaintiff Wright acquired a separate estate in the property, and a right to the exclusive possession of it. Creditors of the firm might contest the *bona fides* of the transaction, if it was attempted to withdraw the property and place it beyond the reach of the creditors of the three, for debts created in its purchase, but as between the parties the agreement vested the property, and the exclusive right of possession, in Wright. (*Ex parte Ruffin*, 6 *Vesey*, 119. *Ex parte Williams*, 11 *Id.* 3. *Coll. on Part.* 509. *Boynton* v. *Page*, 13 *Wend.* 425; and see *Story on Part.* §§ 357, et seq. 396.) If Wright had not been in possession of the property at the time of the agreement, the transfer would have vested the title in him, and authorized him to take possession whenever he pleased, or to claim the property of any person in whose possession he should find it, not having a title valid as against him. And I then held that the plaintiff had a remedy at law, and that his defeat at the circuit did not give to a court of equity jurisdiction in the premises. (*Vilas* v. *Jones*, 1 *Comst.* 274. *Green* v. *Clarke, in court of appeals, MS. Story's Eq. Jur.* § 897. 7 *Cranch*, 332. 1 *John. Ch.* 91.) Upon a review of the questions, which I think are the same essentially in both actions, I see no reason to change my opinion. Indeed the able counsel for the defendant did not, upon the argument of this cause, controvert the positions taken by him upon the demurrer in the equitable action;

or passed upon on the decision of the demurrer therein. His argument was based principally upon facts and positions which we think are not properly presented upon the bill of exceptions in this cause, and which we therefore do not consider. My associates are also of the opinion that the defendant is not, as against the plaintiff, a bona fide purchaser of the property, or of the interest of W. & B. therein: that the circumstances establish very clearly the fact that he took his title with full knowledge of the legal and equitable rights of the plaintiff, and with a view to deprive him of them, and with the intent to defraud him and the creditors of the three of their just rights, and that for that reason the learned judge erred in withdrawing the case from the jury, and directing a verdict for the defendant.

A new trial is granted; costs to abide the event.

[JEFFERSON GENERAL TERM, July 7, 1851. *Pratt, Gridley, Allen* and *Hubbard*, Justices.]